IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

LORI C. COPPERNOLL,

                Plaintiff,

                                         OPINION AND ORDER

v.

                                         08-cv-382-bbc

MICHAEL ASTRUE,
Commissioner of Social Security,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This is an action for judicial review of an adverse decision of the commissioner of Social Security brought under 42 U.S.C. § 405(g).  Plaintiff Lori C. Coppernoll, who suffers from neck and back pain and headaches, seeks reversal of the commissioner's decision that she is not disabled and therefore ineligible for Disability Insurance Benefits under Title II, codified at 42 U.S.C. §§ 416(i) and 423(d).  She raises a number of challenges to the administrative law judge's decision, foremost of which is that the administrative law judge failed to cite reliable evidence for his conclusion that a significant number of jobs exist in the regional or national economy that plaintiff can perform.  In addition, she argues that the administrative law judge failed to make a proper finding concerning plaintiff's credibility,

1

failed to properly analyze her headaches, improperly rejected a physical therapist's functional capacities evaluation and failed to consider her asthma, obesity and depression.

The commissioner has utterly failed to respond to plaintiff's persuasive and well-developed attack on the administrative law judge's conclusion regarding the existence of other jobs in the economy.  As a result, I have no choice but to reverse the commissioner's decision and remand this case for further proceedings.  On remand, the administrative law judge must also make a specific finding regarding the effect that plaintiff's headaches have on her ability to work and account for that finding in his residual functional capacity assessment.  It is impossible to discern from his decision in its current form just how he accounted for plaintiff's headaches in arriving at his conclusion that plaintiff is not disabled. In all other respects, I find that the administrative law judge's opinion is supported by substantial evidence.

The following facts are drawn from the administrative record (AR):

FACTS

A.  <u>Background</u>

Plaintiff was born on June 25, 1962, AR 79, and has a high school education,  AR 96. She has relevant work experience as a cashier and floor person at Wal-Mart.  AR 115. Plaintiff applied for disability benefits on June 29, 2005, alleging that she had been disabled

2

since December 8, 2003 because of headaches, low back pain, neck pain with a bulging disc at C5-C6 and left arm pain.  AR 90.


B.  Medical Evidence

1. Examining physicians' reports

On December 8, 2003, plaintiff was seen by Dr. William T. Cooke, complaining of pain in the back of her neck that radiated down her back.  She also had frequent migraines, for which she took over-the-counter migraine medication.  Cooke noted that plaintiff's neck was quite tight with range of motion plus or minus 45 degrees and that her back was tight throughout the cervical, lumbar and thoracic areas.  Cooke diagnosed cervical and lumbar osteoarthritis and spasm and migraines.  He recommended physical therapy, prescribed Neurontin and excused her from work through February 9, 2004.  AR 256.

On January 6, 2004, plaintiff returned to see Cooke and reported that she was still having a fair amount of pain in her upper back and neck area.  Plaintiff reported that she had had intermittent pain and headaches since injuring her head and neck in a work-related car accident in 1994, but that the pain had worsened in the past month.  Cooke noted that plaintiff was taking ibuprofen and Neurontin for pain and Prozac for depression.  Examining plaintiff, he found that she had neck range of motion of plus or minus 45 degrees and normal shoulder range of motion.  Cervical spine x-rays showed some early osteoarthritis but

3

otherwise were negative.  Cooke concluded that plaintiff's back and neck pain was primarily myofascial and recommended that she try a Transcutaneous Electrical Nerve Stimulation (TENS) unit.  AR 255.

On February 4, 2004, plaintiff was evaluated by rheumatologist J. Timothy Harrington.  Reviewing her history, Harrington noted that after plaintiff's car accident in 1994, she had been found to have a small, right-sided disc herniation, but surgery had not been recommended.  On examination, plaintiff had a flattened affect and appeared somewhat fatigued.  She had full range of motion in her neck but was tender.  She had full range of motion in her shoulders.  Her grip and muscle strength in the upper extremities was intact and her spinal contour was normal.  Harrington diagnosed neck injury, remote, related to motor vehicle accident; persisting long term myofascial pain disorder; vascular type headaches; and panic disorder.  He ordered an MRI scan and recommended that she address her mood disorder and maintain a solid rehabilitation program.  AR 191-92.  The MRI scan showed that plaintiff had a posterior disc protrusion encroaching on the ventral surface of the spinal cord.  AR 194, 279.

On March 1, 2004, Cooke noted that plaintiff was still having a moderate amount of cervical pain and headaches.  Plaintiff took over-the-counter migraine medication and used Imitrex occasionally to treat her headaches.  Plaintiff had stiffness and limited range of

motion in the neck, but her upper extremity strength and range of motion were grossly normal. Cooke adjusted her medications and referred her to a neurosurgeon. AR 253.

On March 22, 2004, plaintiff saw Dr. Thomas G. Strauss for a cervical epidural steroid injection. After examining plaintiff, Strauss noted that she had full cervical range of motion exacerbated by right lateral flexion. He diagnosed cervical disc displacement with persistent cervicalgia and cervical radiculopathy. AR 194-95.

On April 1, 2004, plaintiff reported to Cooke that she did not get any relief from the epidural injection and that she had not been taking Neurontin because it made her drowsy. Cooke noted that plaintiff's neck was very painful and that she could only rotate plus or minus 20 degrees. He also noted that plaintiff had pain radiating to the fingers on the left and her left grip strength was limited. AR 252.

When plaintiff returned to Cooke on April 30, 2004, she reported that she had seen Dr. Chan for a neurosurgery consultation and that he had told her that she would probably have to do a light-duty job. After examining her, Cooke found that plaintiff's neck rage of motion was plus or minus 45 degrees with flexion limited to five degrees and extension limited to five degrees. Cooke released plaintiff to light-duty work with a maximum lifting restriction of 10 pounds, but she did not return to work because no light duty work was available at Wal-Mart. AR 251.

5

On August 19, 2004, plaintiff returned to Cooke, complaining of pain in her left shoulder.  An x-ray was normal, but Cooke indicated that plaintiff had pain in her left shoulder with abduction beyond 45 degrees.  He referred her to physical therapy.  AR 250. On September 20, 2004, Cooke gave plaintiff an injection in her left shoulder, noting that she had not gotten relief from physical therapy.  AR 249.  Although the injection provided plaintiff with some temporary relief, her symptoms returned.  At a visit with Cooke on October 25, 2004, she reported that her left shoulder was tightening up and pain was radiating down the arm, with intermittent numbness in the hand.  Plaintiff was not sure whether she was still taking her Neurontin three times a day.  She was taking ibuprofen and Imitrex fairly often for her migraines.  Cooke increased her dosage of Neurontin and prescribed Fioricet for the migraines.  He said she should take Imitrex no more than three times a week.  AR 248.

On November 29, 2004, plaintiff saw Dr. Thomas Beck, an orthopedist, for an evaluation of her left arm pain.  He diagnosed abnormal motion of the left shoulder blade and cervical disc pathology.  He recommended physical therapy, but questioned whether this would help plaintiff in light of her preconceived notion that therapy did not help her. Plaintiff agreed to physical therapy.  AR 246-47.

On December 2, 2004, Cooke indicated that he thought it would be difficult for plaintiff to return to work that involved lifting more than 10 pounds.  He encouraged plaintiff

6

to walk and perform her physical therapy exercises as tolerated to address her recent problems with weight gain. AR 245. He adjusted her medications, adding Zoloft.

On January 29, 2005, Cooke wrote to plaintiff's lawyer about plaintiff's 1994 accident. In Cooke's opinion, plaintiff's 1994 accident contributed to her periodic headaches and neck pain but he thought she also might have a separate migraine component to her headaches. He explained that when plaintiff had a severe migraine headache, she needed to take medication and rest in a dark room until the headache subsided, which could take from two hours to a whole day. He concluded that there might be days when plaintiff was unable to work because of her headaches, although it was difficult for him to predict how often this would occur. Cooke recommended a functional capacity evaluation for plaintiff. AR 276-77.

On February 3, 2005, plaintiff saw Cooke, reported that she had had more headaches and felt nauseated since starting the Zoloft. Plaintiff was taking Excedrin up to six times a day and Imitrex up to twice a week. After Cooke discontinued the Zoloft, plaintiff's headaches improved somewhat. AR 234-44.

On October 10, 2005, plaintiff began seeing Dr. James Dickman, who prescribed Vicoprofen for her neck and shoulder pain, Verapamil daily and Relpax as a rescue medication for her headaches and continued her on Prozac for anxiety. AR 239-40. On October 24, 2005, Dickman noted that a magnetic resonance imaging scan of plaintiff's left

shoulder showed mild tendinitis.  He gave her an epidural injection.  Dickman noted that plaintiff's migraines had gotten much better on the Verapamil.  AR 238.

Plaintiff did not receive treatment for her migraines or neck pain until about a year later.  On November 1, 2006, plaintiff was seen by Dickman for migraines.  She had stopped taking the Verapamil and was taking the Relpax as needed.  AR 304.  On December 1, 2006, plaintiff reported to Dickman that she had not had a headache in the previous month.  AR 299.

On April 12, 2007, plaintiff was seen in urgent care with left-sided neck and shoulder pain, arm numbness and tingling.  She reported doing spring cleaning, which had involved a lot of lifting and twisting.  After consulting with Dickman, the urgent care doctor gave her an injection of 30 milligrams of Toradol.  AR 297.  On April 16, 2007, plaintiff saw Dickman, who prescribed Ultram and Soma for her left shoulder pain.  AR 296.


2.  Functional capacities evaluation

On March 7, 2005, physical therapist Michael Miller performed a functional capacity evaluation of plaintiff, using a method known as the Blankenship System.  AR 199.  Miller informed plaintiff before the evaluation that she would not be asked to perform any activity she did not think she could perform and she could stop any test secondary to pain, if she desired.  AR 200.  During the testing, Miller used the test's validity profile to determine

8

whether plaintiff was exerting her best effort.  He scored plaintiff on 31 validity criteria and she passed 28, or 90%.  From these results, Miller concluded that the results of the evaluation were valid and that plaintiff had exerted excellent effort.  AR 211-13.

Miller indicated that plaintiff's left neck rotation was 45 degrees or 50% and her right neck rotation was 60 degrees or 66%.  He also noted that her left shoulder elevation was 135 degrees and the right shoulder elevation was 170-180 degrees or normal.  AR 202-03.  Miller concluded that plaintiff could sit, stand and walk occasionally (from 3 to 33% of the work day), reach forward occasionally, could not use arm controls or do fine hand work with the left hand, bend and carry infrequently and lift 10 pounds occasionally.  He classified plaintiff as being unable to work, indicating that plaintiff did not appear to be capable of performing even sedentary work because of her inability to tolerate use of her left arm and her need for frequent breaks.  AR 199.

3.  Non-examining physicians

On September 16, 2005, state agency physician Mina Khorshidi completed a physical residual functional capacity assessment for plaintiff.  She listed plaintiff's diagnoses as cervical disc protrusion, left shoulder impingement and migraines.  Khorshidi concluded that plaintiff could lift 10 pounds occasionally and less than 10 pounds frequently, stand or walk six hours in an eight-hour work day and sit at least two hours in an eight-hour work day.  AR 228-35.

9

She indicated that the findings of the March 2005 functional capacity evaluation were not supported by the objective physical findings.  AR 234.

On January 11, 2006, state agency physician Syd D. Foster completed a physical residual functional capacity assessment for plaintiff.  He listed plaintiff's diagnoses as cervical disc protrusion, left shoulder impingement and migraines.  He found that plaintiff could lift 10 pounds occasionally and less than 10 pounds frequently, and sit, stand or walk six hours in an eight-hour work day.  Foster also found that plaintiff was limited in reaching in all directions including overhead and should avoid concentrated exposure to hazards.  AR 267-74.  Foster noted that there were no medical source opinions that differed significantly from his findings.  AR 273.

On September 15, 2005 and January 13, 2006, state agency psychologists reviewed the record and determined that plaintiff had an anxiety disorder, but that it was not severe.  AR 214-17, 275.

4.  Plaintiff's headache log

From February 2007 through October 2007, plaintiff kept a log of her headaches.  She recorded five moderate or severe headaches in February, five in March, six in April, five in May, four in June, six in July, four in August, nine in September and nine in October.  Plaintiff noted in July that she was no longer able to afford Relpax.  AR 159-68.

10

C.  <u>Hearing Testimony</u>

1.  <u>Plaintiff</u>

Plaintiff testified that she was right handed, stood five feet eight inches and weighed about 213 pounds.  AR 325.  She testified that she had last worked as a department manager at Wal-Mart.  AR 327.  Her job duties required her to be on her feet throughout the work shift, lift between 25 to 50 pounds and use both hands to reach overhead.  AR 328.

Plaintiff testified that she had been in a car accident in 1994 and went back to work with restrictions after seven months.  AR 329-30.  She explained that she stopped working in December 2003 because she had pain in her neck and her left shoulder and was having headaches.  AR 330-31.  She testified that she had tightness, burning sensations and irritating pain in her neck but that sometimes she got relief from this discomfort.  AR 331.  Plaintiff further testified that she had intermittent pain in her left shoulder that continued down through her arm.  AR 332.

Plaintiff testified that if she did light housekeeping tasks for more than 10 to 15 minutes she started to feel pain in her neck and left shoulder and arm.  She described the pain at the level of five or six on a pain scale of zero to 10.  AR 333.  Plaintiff testified that changing the position of her head aggravated the pain in her neck and shoulder.  AR 334.

Plaintiff testified that she drove her daughter a couple of blocks to school, could do about 10 to 15 minutes of sustained activity at a time and took a two-hour nap every

11

afternoon because her pain reached the level of an eight on the zero to 10 scale.  AR 335.

She further testified that  she could not lift much weight with her left hand and that she could

stand or walk only about a half hour before she has pain.  AR 337.

Plaintiff said that she had had migraine headaches since her accident in 1994.  She

explained that her headaches were accompanied by nausea, light sensitivity and dizziness.

AR 339-40.  She testified that she had taken Relpax for her headaches but could no longer

afford it, noting that the medication cost $200 for 12 tablets.  AR 340.  Plaintiff estimated

that she would miss five to six days of work a month because of her migraine headaches.  AR

341.  She testified that she had not seen a doctor about her headaches for 14 months because

she had medication for them, but that currently she was not taking any because she could not

afford it.  AR 343.

Plaintiff testified that she could not work at a job that required her to sit in a fixed

position for a long period of time or move her head repeatedly up and down.  AR 345.  She

testified that she took typing in high school but that now she was able to type only by a hunt-

and-peck system.  AR 348.  Plaintiff said that after her car accident, she had started having

panic attacks when driving or riding in a car, although she still drove around town.  AR 345-

46.  She had not been to a psychiatrist for at least five years.

12

2.  Vocational expert

Robert J. Neuman testified at the hearing as the neutral vocational expert.  In his first hypothetical question, the administrative law judge asked Neuman to assume an individual of plaintiff's age, education and work experience with the residual functional capacity to perform sedentary work with no driving, occasional use of the non-dominant arm and minimal head movement.  Neuman testified that such an individual could not perform plaintiff's past jobs and that there would be few, if any, other jobs that plaintiff could perform.  Neuman explained, " My reason being, even in sedentary jobs, with information clerks, interviewers, you're going to have frequent head movement whether it be to the left or right or looking up to see somebody."  AR 352.

The administrative law judge then modified the hypothetical to include occasional head movement rather than minimal head movement.  In that case, Neuman said, the individual would be able to perform 2,100 jobs as an information clerk and 700 jobs as an interviewer.  If the individual could move her head frequently, Neuman said, then the individual could perform an additional 1,200 office clerk jobs.  He explained that these jobs are unskilled with an SVP of 2 or less.  (The Dictionary of Occupational Titles lists a specific vocational preparation time (SVP) for each occupation.  Unskilled work corresponds to an SVP of 1-2.  Social Security Ruling  00–4p).  Neuman also testified that in competitive employment, any

unscheduled absences exceeding five days in a three-month period would be unacceptable.  AR 354.

In response to questioning by plaintiff's lawyer, Neuman testified that the <u>Dictionary of Occupational Titles</u> number for sedentary information clerk was 237.367-046 and the number for unskilled, sedentary interviewer was 205.367-014.  The lawyer asked the expert whether the technology involved for the interviewer job, which was described in the <u>Dictionary</u> as a person who would interview customers applying for charge accounts, would have changed since 1977, the date the <u>Dictionary</u> was published.  Neuman said that now the job would involve keyboarding and that it might take an individual with occasional use of the non-dominant hand a little longer than thirty days to learn the job.

Neuman testified that he had relied on the <u>Occupational Employment Quarterly</u> in conjunction with the <u>Specific Occupational Selector,</u> both published by U.S. Publishing Company, as a basis for finding specific <u>Dictionary</u> titles that fit the parameters of the hypothetical and to estimate the number of interviewer and information clerk jobs that existed.  AR 356-57.

The administrative law judge asked Neuman to tell him whether there were other interviewer jobs besides the one interviewing for credit card applications that the hypothetical individual could perform.  Neuman replied that, according to the <u>Dictionary</u> and the <u>Specific Occupation Selector</u>, the position of interviewing for credit card applications was the only

14

sedentary interviewer job.  However, Neuman testified that, based on his personal experience, there would be other entry level positions that the hypothetical individual would be able to perform, even though those jobs were not listed in the <u>Dictionary</u>.  AR 357-58.  He did not identify what number of these jobs were available in the national or regional economy.

With respect to the occupation of information clerk, Neuman testified that according to the <u>Dictionary</u>, the only such job that would fit the criteria of the hypothetical was that of telephone quotation clerk.  In his professional opinion, however, the individual could also perform the job of mall information clerk.  AR 358.  He did not identify the number of mall information clerk jobs available in the national or regional economy.

## E.  <u>Post-hearing Evidence</u>

The administrative law judge allowed plaintiff to submit additional materials after the hearing.  AR 361.  On February 12, 2008, plaintiff filed a letter objecting to the reliability of the vocational expert's testimony as to the jobs that plaintiff could perform and their numbers. AR 169-172.  She included a June 7, 2006 letter from a financial consultant stating that the job of "telephone quotation clerk" no longer exists.  AR 181-182.  Plaintiff also submitted an affidavit of Alicia Holmes, a mall clerk, who averred that the job of mall clerk was a skilled job requiring standing for most of an eight-hour work day.  AR 189-190.

In addition to challenging the expert's testimony regarding plaintiff's ability to perform the jobs of interviewer and information clerk, plaintiff challenged the reliability of the vocational expert's testimony regarding the numbers of those jobs that existed in Wisconsin. Plaintiff argued that the <u>Occupational Employment Quarterly</u> upon which the expert had relied as a basis for his estimates was unreliable because it came with the following disclaimer:

DATA LIMITATION

The Dictionary of Occupational Titles (DOT) is a publication of the U.S. Department of Labor. It provides job descriptions and worker requirement information for 12,741 individual jobs found in the national economy. All DOT titles have been assigned a corresponding Census Code by the National Crosswalk Service Center in Des Moines, Iowa. U.S. Publishing has published a crosswalk for the Census and DOT. It is called the Specific Occupation Selector (SOS) manual and shows all DOT codes and titles grouped by Census Codes. When using the Occupational Employment Quarterly in conjunction with the SOS Manual to estimate the number of individuals employed in a specific DOT job, local knowledge of the labor market should be used. No government agency reports employment by specific DOT codes.

Plaintiff argued that the vocational expert's testimony was unreliable because he had ignored this disclaimer and relied on the statistics provided in the Occupational Employment Quarterly. In addition, argued plaintiff, U.S. Publishing derived its figures using arbitrary assumptions about the distributions of jobs within a census code. Plaintiff explained these methodological shortcomings as follows:

The fundamental problem is that U.S. Publishing relies upon data they obtained from the Census Bureau. The Census Bureau collects occupational data in the decennial census. The Census Bureau utilizes its own "census code" format for

analyzing vocational data.  There are fewer than 1,000 census codes describing occupations.  By contrast, there are over 12,000 DOT occupations.  The "census code" system does not describe jobs by exertional demand or skill level.

According to the VE, the occupation of "telephone quotation clerk" was reported by the U.S. Publishing under Census Code 540.  Census Code 540 describes these jobs as "receptionists" and "information clerks".  U.S. Publishing notes that there are 14 DOT occupations reported under Census Code 540 and that only 1 of those is of a sedentary/unskilled nature.  The methodology of U.S. Publishing is to then report that 1/14 of all the occupations reported under Census Code 540 by the Census Bureau of a [sic] unskilled sedentary nature.  While this is a methodology, it is not a reliable methodology as it makes arbitrary assumptions about the distributions of jobs within a census code.

AR 171.


### F.  The Administrative Law Judge's Decision

In reaching his conclusion that plaintiff was not disabled, the administrative law judge performed the required five-step sequential analysis.  20 C.F.R. § 404.1520.  At step one, he found that plaintiff had not engaged in substantial gainful activity since December 8, 2003, her alleged onset date.  At step two, he found that plaintiff had severe impairments of degenerative disc disease of the cervical spine, intermittent left shoulder impingement and headaches.  The administrative law judge found at step three that plaintiff did not have an impairment or combination of impairments that met or medically equaled any impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  AR 38.

17

The administrative law judge determined that plaintiff retained the residual functional capacity to perform sedentary work with no more than occasional use of the non-dominant left upper extremity and no more than occasional repetitive head movement.  At step four, he found that plaintiff's limitations would prevent her from performing her past relevant work. AR 38.

At step five, the administrative law judge relied on the testimony of the vocational expert in response to the second hypothetical to find that there were jobs available in the national economy that plaintiff could perform.  Addressing plaintiff's challenge to the reliability of that testimony, he wrote:

> The post-hearing memorandum took issue with the testimony of the vocational expert, asserting that the jobs he identified did not correspond to the Dictionary of Occupational Titles, nor were the number of jobs cited accurate; further, there were additional considerations to those jobs which would preclude claimant from doing them.  The memorandum further offered anecdotal commentary from some of claimant's representative's own "experts," disputing the vocational expert's perceived overgeneralizations.

> In response, the undersigned emphasizes that the jobs cited by this expert, as is the case with all experts in disability hearings, are meant to only be representative of the total number of such jobs in the economy.  The standard for meeting what is considered a "significant" number of jobs under the current law is not high and, where the functional capacity permits, it is not even remotely surprising that a significant number can be identified in a state with 6 million people.  See, e.g., Sullivan v. Lee, 988 F.2d 789 (7th Cir. 1993) (cites a case in which 174 jobs was considered significant).  Chipping away at a total of (at least) 2,800 jobs is a red herring approach in this case.  It is obvious that unless this 45-year old high school graduate with a semi-skilled background can

18

> function in only an extremely limited sedentary range, she is not disabled.  The
> dispositive issue here is the extent of her impairment and resulting limitations.

AR 35-36.  Therefore, the administrative law judge found that plaintiff was not disabled from

December 8, 2003 through the date of his decision.  AR 38.

The Appeals Council denied plaintiff's request for review, making the administrative

law judge's decision the final decision of the commissioner.  Plaintiff now seeks judicial review

of the commissioner's final decision pursuant to 42 U.S.C. § 405(g).  Plaintiff contends that

the administrative law judge failed to make a proper credibility finding, did not properly

analyze the evidence concerning her headaches, improperly rejected Miller's functional

capacities evaluation and failed to consider her asthma, obesity and depression.  She also

contends that the administrative law judge failed to meet his burden of showing that there was

a significant number of jobs available in the national economy that she could perform.

OPINION

A. <u>The Five-Step Sequential Evaluation Process</u>

To be entitled to disability insurance benefits or supplemental security income under

the Social Security Act, a claimant must establish that she is under a disability.  The Act

defines "disability" as the "inability to engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment which can be expected to result in

19

death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).

Social Security regulations require the commissioner to apply a five-step sequential analysis in determining whether a claimant is disabled under the Act. 20 C.F.R. § 404.1520. The initial inquiry under this five-step framework requires a determination as to whether the claimant is engaged in substantial gainful work.  20 C.F.R. § 404.1520(b).  If the claimant is not engaged in substantial gainful work, the commissioner must next determine whether the claimant has a "severe impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities . . .".  20 C.F.R. § 404.1520(c). If a severe impairment or combination of impairments is found to exist, the commissioner must then determine whether the impairment meets or equals a listed impairment in Appendix 1.  20 C.F.R. § 404.1520(d).  If the impairment fails to meet or equal a listing in Appendix 1, the commissioner must "assess and make a finding about the claimant's "residual functional capacity" based upon all available evidence in the record. 20 C.F.R. § 404.1520(e).  The claimant's residual functional capacity assessment is then utilized at steps four and five (where required) in order to determine whether the claimant can engage in past relevant work or other work existing in the national economy.  20 C.F.R. § 404.1520(f), (g).

The initial burden is on the claimant to prove that a severe impairment prevents her from performing past relevant work.  If she can show this, then the burden shifts to the commissioner to show that despite the severe impairment the claimant is able to perform other work "which exists in significant numbers either in the region where [the claimant] lives or in several regions of the country."  Stevenson v. Chater, 105 F.3d 1151, 1154 (7th Cir. 1997); 42 U.S.C. § 423(d)(2)(A).  This shifting of the burden to the commissioner is not statutory, "but is a long-standing judicial gloss on the Social Security Act."  Walker v. Bowen, 834 F.2d 635, 640 n. 3 (7th Cir. 1987).  Although there is no statutory floor for what constitutes a "significant number" of jobs, courts have found that even fewer than 750 available positions amounts to a significant job base.  Lee v. Sullivan, 988 F. 2d 789, 794 (7th Cir. 1993) (citing cases); Wells v. Astrue, 2009 WL 142404, *17 (E.D. Wis. Jan. 17, 2009) (slip opinion) (finding 420 jobs in Milwaukee area and 1,300 jobs in Wisconsin to be significant number). The court must uphold the commissioner's findings if they are supported by substantial evidence and not founded on errors of law.  42 U.S.C. § 405(g); Skinner v. Astrue, 478 F.3d 836, 841 (7th Cir. 2007).  Substantial evidence exists if a reasonable person could conclude that there is enough evidence to support the conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971).

21

B.  Step Five

At the last step of the sequential evaluation process, the administrative law judge can satisfy the commissioner's burden by relying on one of the Medical-Vocational Guidelines found in 20 C.F.R., Subpart P, App. 2.  Caldarulo v. Bowen, 857 F.2d 410, 413 (7th Cir. 1988).  These rules take administrative notice of the numbers of unskilled jobs that exist throughout the national economy at the various functional levels (sedentary, light, medium, heavy and very heavy), taking into account the other vocational factors of age, education and work experience.  20 C.F.R., Subpart P, App. 2, § 200.00(b).  Because the rules account only for limitations that affect the person's ability to meet the exertional requirements of jobs, they are dispositive only when the person's limitations are exertional in nature (e.g., limitations on sitting, standing, amount of weight lifted).  20 C.F.R., Subpart P, App. 2, § 200.00(e).  When a person has additional non-exertional limitations (such as limitations on the ability to balance, manipulate objects, hear, see, perform mental tasks or tolerate environmental conditions such as heat, cold, dust and fumes), the guidelines can be used only as a "framework for consideration" and the administrative law judge must cite other evidence for his conclusion that there are significant numbers of jobs that the claimant can perform.  Id.

The commissioner's regulations recognize that in some cases, a person's non-exertional limitation may be so insignificant that it is obvious that it would not diminish the relevant job base and the relevant Medical-Vocational Guideline may still be applied.  Soc. Sec. Ruling 83-

22

14. In "more complex" cases, however, the administrative law judge may need the assistance of a vocational expert. Id. The Court of Appeals for the Seventh Circuit has said that a vocational expert is not required if there is "reliable evidence of some kind that would persuade a reasonable person that the limitations in question do not significantly diminish the employment opportunities otherwise available." Warmoth v. Bowen, 798 F.2d 1109, 1112 (7th Cir. 1986).

In this case, the administrative law judge found that plaintiff did not retain the residual functional capacity to perform a full range of sedentary work because she had limitations on her ability to use her left arm and move her head. Therefore, to determine the extent to which these limitations eroded the unskilled occupational base, the administrative law judge asked the vocational expert whether jobs existed in the national economy that an individual of plaintiff's age, education, work experience and residual functional capacity could perform. A vocational expert's testimony, even if little more than a "bottom line," may satisfy the commissioner's burden to produce evidence of a significant number of jobs provided no one questions the basis of the vocational expert's conclusions at the hearing. Donahue v. Barnhart, 279 F.3d 441, 446 (7th Cir. 2002). Where, however, the claimant challenges the foundation of the expert's opinions, the administrative law judge must make an inquiry to ensure that the testimony is reliable. Overman v. Astrue, 546 F. 3d 456, 464 (7th Cir. 2008); McKinnie v.

23

<u>Barnhart</u>, 368 F.3d 907, 910 (7th Cir. 2004); <u>Donahue v. Barnhart</u>, 279 F.3d 441, 446 (7th Cir. 2002).

Plaintiff waged a vigorous attack on the reliability of the expert's testimony both at and after the hearing.  She offered affidavits in support of her claim that the job of "telephone quotation clerk" listed in the <u>Dictionary of Occupational Titles</u> was obsolete and that the alternative job of "mall clerk" identified by the vocational expert did not fit plaintiff's limitations, and she submitted documentary evidence supporting her contention that the data underlying the vocational expert's opinion was unreliable because it was based upon a flawed methodology.  The administrative law judge shrugged off this attack, essentially deeming plaintiff's evidence irrelevant because it was "obvious" that plaintiff was not disabled given her age, background and limitations.  But if it was "obvious" that plaintiff's non-exertional limitations would not significantly reduce the relevant job base, then why didn't the administrative law judge rely on the Medical-Vocational Guidelines and disregard the expert's testimony?  As plaintiff points out, the fact is that, having concluded that plaintiff had non-exertional limitations that prevented her from performing the full range of sedentary work, the administrative law judge could *not* rely on the guidelines and was required to adduce additional, *reliable* evidence to show that a significant number of jobs existed in the regional or national economy that plaintiff could perform.  His mere say-so does not constitute reliable evidence.  <u>Getch v. Astrue</u>, 539 F.3d 473, 482 (7th Cir. 2008).

24

The commissioner does not argue otherwise.  In fact, the commissioner has not made any argument at all in defense of the administrative law judge's step five rationale.  Nor has the commissioner responded in any fashion to the second part of plaintiff's step-five argument, which is that the vocational expert's testimony does not constitute reliable evidence to back up the administrative law judge's step five finding.  The only argument the commissioner addresses is plaintiff's contention that the vocational expert offered inconsistent testimony regarding the frequency with which head movement is required of information clerks and interviewers, but this is a challenge entirely separate from plaintiff's attack on the reliability of the expert's job data.  With respect to the job data, plaintiff makes a facially persuasive argument why the vocational expert's testimony was flawed regarding the types of jobs plaintiff could perform and their numbers.  Whether the commissioner's failure to respond to that argument this was intentional or a mere oversight, he has waived his opportunity to dispute it.  Kochert v. Adagen Medical Int'l, Inc., 491 F. 3d 674, 679 (7th Cir. 2007) (undeveloped arguments are waived).  It may well turn out to be the case that plaintiff's attempt to refute the vocational expert's testimony is a "red herring approach," as the administrative law judge found, but I decline to make that determination without hearing the commissioner's position.

Absent some attempt by the commissioner to defend his decision, I have no choice but to remand this case for a new step five determination.  On remand, the administrative law

25

judge should also resolve an apparent inconsistency in Neuman's testimony regarding the frequency with which head movement is required of information clerks and interviewers.  In answer to the administrative law judge's hypothetical question assuming an individual limited to sedentary work with occasional use of the non-dominant arm and "minimal" head movement, Neuman responded that there would be few, if any, jobs that the individual could perform because even the sedentary jobs of information clerk and interviewer required frequent head movement.  However, when the administrative law judge changed the hypothetical question to include "occasional" head movement, Neuman testified that the individual could perform those very jobs.  Although the commissioner makes a persuasive argument that Neuman could not have been using the term "frequent" as a vocational term of art in response to the first hypothetical, I leave it to the administrative law judge to resolve that question on remand.

For the sake of completeness and to guide the parties on remand, I address plaintiff's other challenges to the commissioner's decision.

## C. Residual Functional Capacity Assessment

### 1.  Plaintiff's subjective complaints

Under Social Security Ruling 96-7p, an administrative law judge must follow a two-step process in evaluating an individual's own description of his or her impairments:  1) determine

whether an "underlying medically determinable physical or mental impairment" could reasonably be expected to produce the individual's pain or other symptoms; and 2) if such a determination is made, evaluate the "intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities."  Soc. Sec. Ruling 96-7p, 1996 WL 374186, *1 (1996); Scheck v. Barnhart, 357 F.3d 697, 702 (7th Cir. 2004).  When conducting this evaluation, the administrative law judge may not reject the claimant's statements regarding her symptoms on the sole ground that the statements are not substantiated by objective medical evidence. Instead, the administrative law judge must consider the entire case record to determine whether the individual's statements are credible.  Relevant factors the administrative law judge must evaluate are the individual's daily activities; the location, duration, frequency and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; other treatment or measures taken for relief of pain; the individual's prior work record and efforts to work; and any other factors concerning the individual's functional limitations and restrictions.  SSR 96-7p; 20 C.F.R. § 404.1529(c).  See also Scheck, 357 F.3d at 703; Zurawski, 245 F.3d at 887.  The administrative law judge's decision must contain "specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear

27

to the individual and to any subsequent reviewer the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p; <u>Arnold v. Barnhart</u>, 473 F.3d 816, 822 (7th Cir. 2007).

Plaintiff argues, unpersuasively, that remand is required because the administrative law judge did not make a credibility determination.  It is true that the administrative law judge did not make any specific finding that included the word "credibility" or other boilerplate language signifying a credibility assessment.  Nonetheless, his decision makes clear the weight he gave to plaintiff's statements and the reasons for that weight.  In his decision, the administrative law judge reviewed the medical evidence from 2003 through 2007, plaintiff's testimony at the hearing and the residual functional capacity assessments by the state agency physicians.  He then stated as follows:

> Claimant's two primary complaints are the headaches and shoulder pain. Regarding the former, the undersigned gives little weight to claimant's headache log offered at the hearing which would seem to conflict with the last treatment records in the file where as of November-December 2006, after an absence of almost a year with her regular physician, Dr. Dickman, plaintiff conceded to him that the medication for her headaches was working fairly well and between the November and December visits had not had any headaches at all.  Claimant did concede at the hearing that in June 2007 she had run out of the Relpax that she was taking for headaches, which may have perhaps explained to some extent the numerous complaints in her headache log.  There have been no referrals to a neurologist regarding the headaches, no CT or MRI scans of the head done, nor anything out of the ordinary to suggest plaintiff's headache complaints are all that severe or incapacitating.

Regarding the neck and shoulder complaints, which claimant attributes to the motor vehicle accident, the shoulder/arm is her nondominant one, and just as notation regarding headache complaints have tended to be intermittent at times, so too have been the arm and shoulder complaints. Obviously the spring cleaning in April 2007 suggested that [sic] claimant to be somewhat more active with both her upper extremities, especially when contrasted with the claims she made to the physical therapist prior to her functional capacity evaluation in 2005 or for that matter contrary to her testimony at the hearing. Claimant conceded that the alleged numbness down her arm was not constant and that it "comes and goes." An MRI of the shoulder done in 2004 was minimally positive. There has been no shoulder surgery and in the lone orthopedic evaluation of the shoulder by Dr. Beck, he expressed doubt as to whether any condition related to the shoulder was responsible for her pain complaints. He did not rule out possible impingement syndrome, but expressed doubt as to whether claimant was even willing to address that via physical therapy, noting that claimant was not all that enthusiastic about committing herself to such. As to the cervical spine, again there has been no surgery nor the suggestion of the need for such. Claimant does have some degenerative disc disease and a small bulging disc, but her range of motion has in most instances been fairly good, certainly nothing that should prohibit her from turning her head on an occasional basis. The undersigned has gone to considerable effort in documenting chronologically the medical records in the file to underscore that findings have not been all that impressive and to point out that there have been major gaps in treatment.

AR 37. It takes little reading between the lines to discern from these paragraphs that the administrative law judge gave little weight to plaintiff's contention that her headaches and neck and shoulder pain were disabling. Further, the reasons for that determination are clear: plaintiff's allegations were not supported by the objective medical findings, her course of treatment and her activities. Contrary to plaintiff's suggestion, the administrative law judge was not required to address each and every statement plaintiff made at the hearing regarding

29

her symptoms and limitations.  Getch, 539 F.3d at 480 (administrative law judge need not address every piece of evidence or testimony presented, but must provide logical bridge between evidence and conclusions).  What is more, he captured many of plaintiff's subjective complaints in his residual functional capacity assessment, limiting plaintiff to sedentary work with little use of the left hand or head movement.  To remand this case simply because the administrative law judge did not use the word "credibility" or some other magic phrase would be a pointless exercise.  Accord Pugh v. Bowen, 870 F.2d 1271, 1274 (7th Cir. 1989) (administrative law judge's failure to refer to commissioner's ruling regarding onset date not fatal where decision showed that administrative law judge conducted requisite analysis).

More persuasive is plaintiff's argument that the administrative law judge's assessment of her headaches is internally inconsistent and defies informed review.  As plaintiff points out, the administrative law judge found at step two that plaintiff's headaches were "severe," that is, that they posed a significant limitation on plaintiff's ability to do basic work activities.  20 C.F.R. § 404.1521(a).  However, the administrative law judge did not make any finding regarding how plaintiff's headaches would affect her ability to work.  Instead, in finding that the headaches were "not all that severe or incapacitating," he appears to have found that plaintiff's headaches posed only minimal or no limitations, which is inconsistent with his step two finding.  Either plaintiff's headaches do not pose more than a minimal effect on her ability to work, in which case he should have found them to be non-severe at step two, or they do,

30

in which case he should have should have made a specific finding regarding the effects that plaintiff's headaches would have on her ability to work. Although the record may support his determination that plaintiff's headaches are "not all that severe or incapacitating," that determination is not a specific functional limitation. Soc. Sec. Ruling 96-8p (when claimant has "severe" impairment that does not meet or equal listed impairment, "the sequential evaluation process generally must continue with an identification of the individual's functional limitations and restrictions and an assessment of his or her remaining capacities for work-related abilities").

Further, although the administrative law judge indicated that plaintiff's increase in the frequency of her headaches could have been a result of her having "run out" of the Relpax, he failed to account for the fact that plaintiff stated that she could no longer afford the medication. If the Relpax had been effective in controlling her headaches and the administrative law judge believed plaintiff's testimony that she could no longer afford it, then he should have considered the frequency and severity of plaintiff's headaches without the medication. It is unclear from his decision whether he did so. Steele v. Barnhart, 290 F.3d 936, 940 (7th Cir. 2002) (administrative law judge's decision cannot stand if it "is so poorly articulated as to prevent meaningful review"). Accordingly, on remand, the administrative law judge should make a specific finding regarding the effect that plaintiff's headaches have on her ability to work and incorporate that finding into his residual functional capacity assessment.

31

2.  <u>March 2005 functional capacity evaluation</u>

Plaintiff contends that the administrative law judge erred in rejecting the functional capacity evaluation completed in March 2005 by the physical therapist, Miller.   The administrative law judge afforded little weight to the evaluation, explaining his rationale as follows:

> Mr. Miller tested plaintiff using the Blankenship System.  During the course of testing Mr. Miller indicated that he did not believe claimant was exaggerating or overreacting based on his observations.  However, it is significant to note that claimant was not required to attempt anything she felt she could not perform.  This self-imposed limitation raises the question of whether the evaluation may have led to an underestimate of claimant's capabilities.  Further, in a preliminary physical examination, Mr. Miller's measures regarding range of motion for the cervical spine and shoulder were much lower than those typically noted by the medical doctors who had previously examined claimant--only 50-66% of normal.
>
> . . .
>
> In should be further noted that DDS rejected the formal functional capacity evaluation done by Mr. Miller in March of 2005, stating that it was not supported by the objective medical evidence.  Notwithstanding claimant's focus on that report in the post hearing memorandum, for the reasons already noted in his discussion of that report, the undersigned gives it only limited weight.  He is inclined to give greater weight to the opinion of Dr. Chan, the neurosurgeon who placed claimant at a light residual functional capacity.

AR 33-34, 37.

Plaintiff wages several attacks on the administrative law judge's reasoning.  First, she argues that because there were no treatment records from Chan, the administrative law judge drew an unsupported conclusion when he found that Chan had "placed claimant at a light

residual functional capacity."  All that the records show, argues plaintiff, is that Chan told plaintiff she should perform "light duty work," which does not necessarily equate to a finding that plaintiff could meet the exertional demands of light work.  I agree.  There is nothing in the record to show that when Chan told plaintiff she was limited to "light duty" work, he was using the term "light" as that term is used in the social security regulations.  20 C.F.R. § 404.1567(b) (defining light work as that which involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds").  Nonetheless, I am not persuaded that this error warrants remand.  The administrative law judge did *not* find that plaintiff could perform light work, placing her instead at a sedentary level.  Thus, in spite of declaring that he was "inclined to give greater weight" to Chan's purported opinion that plaintiff could perform work at the light level of exertion, the administrative law judge ultimately did not adopt the opinion.  Further, Chan's opinion does suggest that he thought plaintiff capable of performing *some* type of competitive employment, which is contrary to Miller's opinion that plaintiff could not sustain even sedentary work.

Second, plaintiff argues that the administrative law judge was simply wrong when he found that Miller's measurements of plaintiff's range of motion were less than that found by other examiners.  Plaintiff cites a number of office visits with Cooke in which the doctor noted that her neck range of motion was reduced to around 45 degrees.  However, the specialists who examined plaintiff, Harrington, Strauss and Beck, did not make similar findings, but instead

33

found plaintiff to have normal range of motion in her neck and shoulders.  Thus, there is some evidence to support the administrative law judge's finding.

In any case, the primary reason the administrative law judge appears to have rejected the results of the functional capacities evaluation was the self-limiting nature of the test itself. Plaintiff argues that it was improper for the administrative law judge to reject Miller's report on this basis because plaintiff achieved a 90% pass rate on the test's "validity criteria." According to plaintiff, by concluding that the test results were invalid in spite of Miller's finding to the contrary, the administrative law judge exceeded his bounds and "played doctor." I disagree.  In spite of plaintiff's having passed the test's internal "validity" controls, the administrative law judge could reasonably question its overall reliability when it tested only what plaintiff thought she could do, as opposed to what she could actually do.  It was neither illogical nor unfounded for the administrative law judge to conclude that the initial limiting instruction injected a subjective element into the testing, thereby reducing the test's reliability as an objective measure of plaintiff's capabilities.  Further, as the administrative law judge noted, the consulting physicians for the local disability agency found that Miller's report was inconsistent with the objective medical findings in the record.  These were good reasons for affording little weight to the report.

3.  <u>Non-severe impairments</u>

Plaintiff argues that the administrative law judge's residual functional capacity assessment is flawed because it fails to account for her obesity, depression and anxiety or asthma.  <u>Golembiewski v. Barnhart</u>, 322 F.3d 912, 918 (7th Cir. 2003) (in determining a claimant's residual functional capacity, the administrative law judge must evaluate all limitations that arise from medically determinable impairments, even those that are not-severe).  However, plaintiff points to no evidence in the record to show that her obesity, depression and anxiety or asthma limit her functioning.  The only mental limitation that plaintiff mentioned at the hearing was panic attacks when she drives, but plaintiff acknowledged that she is able to drive in spite of her condition.  The record indicates that her asthma is well-controlled and plaintiff makes no showing that her obesity would affect her ability to perform a sedentary job.  Accordingly, any error on the part of the administrative law judge in failing to include limitations from these conditions in plaintiff's residual functional capacity was harmless.  <u>Prochaska v. Barnhart</u>, 454 F.3d 731, 737 (7th Cir. 2006) (administrative law judge's failure to explicitly account for claimant's obesity may be harmless).

ORDER

IT IS ORDERED that the decision of defendant Michael J. Astrue, Commissioner of Social Security, denying plaintiff Lori Coppernoll's application for disability insurance benefits is REVERSED AND REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.  The clerk of court is directed to enter judgment for plaintiff and close this case.

Entered this 23rd day of June, 2009.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge

36